IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-00272-01-CR-W-BP |
| | ) | |
| JEFFREY L. TRETA, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM:   MOTION AND
SUGGESTIONS IN MITIGATION OF SENTENCE**

COMES NOW the defendant, Jeffrey L. Treta, by and through counsel, William J. Raymond, in accordance with Rule 32, Fed. R. Crim. P., and hereby requests the Court to consider a sentence of fifteen (15) years.   In support, Mr. Treta offers the following:

**BRIEF HISTORY**

Mr. Treta entered a plea of guilty to a six-count indictment.   Mr. Treta pled guilty to two counts of production of child pornography, two counts of production of child obscenity, one count of possession of child pornography and one count of obstruction of justice.   The statutory range of punishment for the Court to consider is not less than 15 years and not more than 30 years on counts one and two, not less than 5 years and not more than 20 years of imprisonment on the counts three and four, not more than 10 years on count five and not more than 20 years on count six. These counts carry a mandatory period of supervised release of five years to life.   The advisory guideline range as recommended by the U.S. Probation Office is 130 years of imprisonment.

**SUGGESTIONS SUPPORTING NON-GUIDELINE SENTENCE**

1

The advisory sentencing guidelines are a factor for the Court to consider but a district court may not begin with the presumption that those guidelines are reasonable. United States v. Alvizo-Trujillo, 521 F.3d 1015, 1018-1019 (8th Cir.2008)(citing United States v. Gall, 128 S.Ct. 586, 596-597 (2007) and United States v. Rita, 127 S.Ct. 2456 (2007)). The Guidelines are the "starting point and the initial benchmark" in determining a sentence, but a court must make an individualized assessment based on the sentencing factors in 18 U.S.C. § 3553(a). Gall at 49-50; United States v. Beiermann 599 F.Supp.2d 1087,1091 (N.D. Iowa 2009). In this case, a number of mitigating factors would suggest that a sentence of fifteen years is sufficient, but not greater than necessary.

In imposing any sentence 18 U.S.C. § 3553 generally directs that the Court shall impose a sentence sufficient, but not greater than necessary. Among the factors for the Court to consider are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford an adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. (See 18 U.S.C. § 3553(a)). An analysis of these factors demonstrates that a sentence of fifteen years is sufficient but not greater than necessary.

**The nature and circumstances of the offense and the history and characteristics of the defendant**

Mr. Treta is a forty-seven year old man. Mr. Treta's mother was a single, 22 year old woman, when he was born. Mr. Treta has never met his biological father. When Mr. Treta was 4 years old, his mother left with him with a friend in Florida. His mother abandoned Mr. Treta to move to California to start a relationship with a man. Mr. Treta was eventually removed from his new home and hospitalized for issues related to neglect. After his mother abandoned him, Mr.

Treta was adopted by his maternal grandparents. Mr. Treta's grandparents were harsh disciplinarians. The "discipline" would routinely leave marks on Mr. Treta.

By the time he was 11 or 12 years old Mr. Treta would spend late night on the streets. When Mr. Treta was 13 he was gang-raped by four men. The pain of the gang rape greatly affected Mr. Treta throughout his life. This experience has led to Mr. Treta suffering from depression and alcoholism.

When he was 15 years old Mr. Treta ran away from his Grandparents home. Mr. Treta went to live with his biological mother. At that time Mr. Treta's biological mother was involved in an abusive relationship. The man was physically and verbally abusive to Mr. Treta and his mother. Mr. Treta was kicked out of the home at 15 and lived on the streets before returning to live with his grandparents.

Mr. Treta managed to graduate from High School in 1986. When Mr. Treta was 18, he enlisted in the United States Army. He was only in the army for approximately 8 weeks before he was discharged due to a medical condition. During a medical evaluation it was determined that Mr. Treta had gastrointestinal issues stemming from his history of abusing alcohol. He was given a medical discharge.

In 1990, Mr. Treta earned an associate's degree in cardiovascular technology from Barna Medical College in Florida. In 1996 Mr. Treta graduated from Keiser University in Florida. Mr. Treta earned an Associate of Science degree in radiology technology. Mr. Treta is licensed in RTR and CVT. Additionally, he is a certified cardiographic technician and a registered vascular stenographer.

Mr. Treta has worked exclusively in the medical field for the past fifteen years. At the

3

time of his arrest, Mr. Treta was working for Encompass Medical Group and KC Mobile MDs. Prior to joining Encompass, Mr. Treta spent five years working for Onsite Medical Imaging. Mr. Treta provided mobile ultrasound and was the technical director for the company. Prior to his time with Onsite Mr. Treta has worked at different hospitals and doctor's offices.

**Reflect the seriousness of the offense; to promote respect for the law, and to provide a just punishment for the offense and to protect the public from further crimes of the Defendant**

Mr. Treta pled guilty to six counts. A sentence of fifteen years would adequately reflect the seriousness of the offense. The facts of this case demonstrate that a sentence of fifteen years is sufficient punishment for the offense.

Although research on recidivism rates for child pornography offenders is scarce, there is some. Additionally, there is a growing amount of research on recidivism rates for "sex offenders" in general. A review of some of the more notable studies can be instructive. What we find is that the recidivism rates for sex offenders, is much lower than what the general public perceives.

Sexual Recidivism

The watershed article in this area was published by Karl Hanson & Monique Boussiere in 1998.[1] Hanson and Boussiere collected and reviewed 61 follow-up studies to examine factors strongly related to recidivism among sexual offenders. This meta-analysis involved nearly 24,000 sex offenders (23,393). The overall recidivism rate for a 5 year follow-up period was only 13.4%.

In 2004, Karl Hanson embarked on a follow-up study to his 1998 meta-analysis.[2] This

---

[1] Hanson, Karl & Boussiere, Monique, Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies, Journal of Consulting and Clinical Psychology, Vol. 66, No. 2, 348-362 (1998).

[2] Hanson, Karl & Morton-Bourgon, Kelly, Predictors of Sexual Recidivism: An Updated

4

time a total of 95 different studies were examined involving more than 31,000 sexual offenders. The overall sexual recidivism rate for convicted sexual offenders was 13.7% over a 5-6 year period.

    Research on Age & Recidivism.

What is more striking is the effect of advanced age on sexual recidivism. There have been several studies in the past 15 years that have addressed this topic. The first study to review sexual recidivism and advanced age was done by Karl Hanson in 2001.[3] Dr. Hanson followed 4,673 convicted sex offenders for a five year period after their release from custody. In general, Dr. Hanson found that there was an inverse relationship between age of release and sexual recidivism. Specifically, it was determined that the sexual recidivism rate for the sex offender released after the age of 60 was 3.8%.

In 2006 three different studies were published reviewing the relations between recidivism and age in sex offenders. Fazel, Sjöstedt, Långström, and Grann (2006) followed all adult male sex offenders released from prison in Sweden from 1993 and 1997 (N=1,303) and recorded criminal convictions for an average of 8.9 years.[4] They divided their sample into age cohorts (<25;25-39;40-54;55+). Recidivism rates decreased significantly in older aged cohorts. In the

---

Meta-Analysis, (2004)

[3] Hanson, Karl, Age and Sexual Recidivism: A Comparison of Rapists and Child Molesters, Sexual Abuse: A Journal of Research & Treatment (2001); also available at the Solicitor General Canada's Internet Site http://www.sgc.gc.ca

[4] Fazel, Seena; Sjostedt, Gabrielle; Langstrom, Niklas; Grann, Martin Risk Factors for Criminal Recidivism in Older Sex Offenders, Sexual Abuse: A Journal of Research and Treatment, 2006.

5

<25 age group, sexual recidivism was 10.7%. In the 25-39 age group, the recidivism rate was 9.4%. The 40-54 age group recidivated at a rate of 5.6%. The sexual recidivism rate for 55+ was 6.1%.

David Thornton (2006) followed a large nationally representative sample (N=752) of sex offenders for a period of 10 years after their release from prison in the United Kingdom.[5] Dividing his sample by age cohort (<18;18-24;25-39;40-59;60+), he also found that the rate of sexual recidivism declined generally with age. Those in the 60+ category had a sexual recidivism rate over a 10 year period of only 4.3%. Importantly, Mr. Treta will be over the age of 60 when he is released from the Bureau of Prisons.

Finally, Hanson (2006) followed a very large sample (N=3,425; compiled over 8 separate samples) of sex offenders released from prison in North America and the United Kingdom.[6] Hanson calculated 5-year recidivism rates for different age cohorts (18-24;25-39;40-49;50-59;60+). Not surprisingly, he found that older sexual offenders have lower sexual recidivism rates than the Static-99 predicted. For those in the 60+ category, the sexual recidivism rate was 2%.

According to the United States Sentencing Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for offenders over age 50. U.S. Sent'g Comm'n, *Measuring Recidivism* at 12

---

[5] Thornton, David, Age and Sexual Recidivism: A Variable Connection, Sexual Abuse: A Journal of Research and Treatment, Vol. 18 No. 2, 123-135 (2006).

[6] Hanson, Karl, Does Static-99 Predict Recidivism of Older Sexual Offenders?, Sexual Abuse: A Journal of Research and Treatment, Vol. 18 No. 2, 343-355 (2006).

6

& Exh.9. For sex offenders, too, recidivism declines with age, and only a very few child sex offenders recidivate after age 60. *See* R.K. Hanson, *Recidivism and Age: Follow-up Data from 4,673 Sexual Offenders*, 17 J. Interpers. Violence 1046, 1054 (2002). "The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage. The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime. The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011). The cost of incarcerating prisoners age 50 and older has been estimated to be two to four times that of the general inmate population. [7] "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified."[8] A sentence in excess of fifteen years would impose additional incarceration and associated costs on an individual who has a significantly unlikely risk to reoffend.

<u>Recidivism of Child Pornography Users</u>

A study consisting of 231 men convicted of possession of child pornography was

---

[7] U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing theNeeds of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 11 (2004) (*Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*), *available at*http://www.nicic.org/pubs/2004/018735.pdf; Oklahoma Department of Corrections, *Managing Increasing Aging Inmate Populations* (Oct. 2008), *available at* http://www.doc.state.ok.us/adminservices/ea/Aging%20White%20Paper.pdf.

[8] William E. Adams, *The Incarceration of Older Criminals: Balancing Safety, Cost, and Humanitarian Concerns*, 19 Nova L. Rev. 465, 466 (1995).

conducted in Switzerland.[9]  The study followed them from 2002 - 2008 for various types of sexual recidivism.  The recidivism rate for use of child pornography was 3.9%.  The recidivism rate of these men convicted of possession of child pornography for a hands on sex offense was only 0.8%.

How does all of this apply to Mr. Treta?  We can start by saying with confidence that those that are convicted for a sexual offense (a majority of which are hands on offenses) have a recidivism rate under 14%.  However, when we look a little closer, we see that the sexual recidivism rate for convicted sex offenders over the age of 60 is significantly lower.  If given a 25 year sentence, Jeffrey Treta will be over the age of 65 upon his release from prison.  The recidivism rates (depending upon the follow-up period and study) ranged from 6.1% - 2%.  Mr. Treta's risk to reoffend in the future is quite low.

It should also be noted that this would be Mr. Treta's first felony conviction and first time he will be sentenced to prison for an extended period of time.  It stands to reason that the likelihood of returning are low.  In this case, protection of the community would be accomplished by a sentence of fifteen years.

<u>Sex Offender Treatment</u>

The Bureau of Prisons offers extensive sex offender treatment programs.[10]  These programs provide treatment and specialized management services to inmates who are convicted of sex offenses.  The goal of these programs is to reduce the incidence of sexual re-offending.

The BOP has specially designated Sex Offender Management Programs (SOMP).  The

---

[9] Endrass et al, <u>The consumption of Internet child pornography and violent and sex offending</u>, BMC Psychiatry, 9:43 (2009).

[10] *See* Bureau of Prisons "Sex Offender Program" Program Statement for description of the entire BOP Sex Offender Treatment and Management Services.

8

SOMP is designed to provide services that minimize the inmate's risk for sexual re-offense. The SOMP employs psychologists and treatment specialists who perform specialized assessments of sexual offenders. These evaluations include risk assessments and diagnostic assessments of psychosexual and associated disorders.

After the evaluation is completed the SOMP offers Sex Offender Treatment Programs (SOTP) to inmates. The SOTP offers high-intensity programs for sex offender treatment. The SOTP provides cognitive-behavioral programs in a modified therapeutic community that has proven effective in reducing inmate recidivism. A modified therapeutic community in a prison setting stresses pro-social values and behaviors that are needed in the outside community.

Additionally, the Bureau of Prisons initiates a review of each sex offender case 18 months from their projected release date to determine whether civil commitment should be recommended for those inmates who have not fully and successfully participated in sex-offender treatment and who pose a future risk to society upon their release. If the BOP believes that an inmate poses a future risk it can recommend that the inmate be civilly committed pursuant to 18 U.S.C. §4248. The BOP conducts an exhaustive evaluation of every inmate with a goal of eliminating sexual reoffending upon release.

Clearly, the BOP has the programs necessary to provide Mr. Treta with the treatment that he needs. The BOP treatment will provide Mr. Treta with the skills necessary to address that issues that were created when he was molested as a child. Further, this treatment has proven effective in insuring that individuals like Mr. Treta do not reoffend or pose a threat in the future.

Deterrence

The empirical evidence is unanimous that there is no relationship between sentence

length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). When it comes to general deterrence, certainty of punishment is more important than severity of punishment. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 30 (2006). Increases in the severity of punishment seldom, if ever, prevent crime. *Id* at 29.

The Sentencing Commission has found that "[t]here is no correlation between recidivism

10

and guidelines' offense level. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. And according to "the best available evidence,. . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. As explained further , *infra*, this is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). In other words, a sentence of fifteen years will provide just as much marginal deterrence as a sentence of 130 years.

Additionally, there is no relationship between increased punishment of an individual offender and the "market" for child pornography. In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that

11

punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").[11] And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); *see also id.* (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography"). But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large,

---

[11] The Sixth Circuit has also indirectly relied on this view when it found "inexplicable" a district court's assessment that a higher sentence in a very similar case will not advance the goal of general deterrence. *See Bistline*, 665 F.3d at 767 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced")).

12

international legal market for child pornography that exists whether Mr. Treta is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010) ["UNDOC, *Globalization of Crime*"], and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, *Globalization of Crime* at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak *et al.*, *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for

13

that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. *Id*. at 7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of having even 592 additional images is miniscule.").

## CONCLUSION

When determining the appropriate sentence the court is required to ***impose a sentence sufficient but not greater than necessary***. A review of Mr. Treta's case in light of the sentencing factors enumerated in 18 U.S.C. § 3553 demonstrates that a sentence of fifteen years is well within

14

the Court's discretion and warranted in this case. The facts of the case demonstrate that Mr. Treta is not a risk to reoffend. A sentence of fifteen years confinement reflects the seriousness of the offense while promoting respect for the law and providing a just punishment. Further, a sentence of fifteen years provides adequate deterrence to criminal conduct while sufficiently protecting the public from further crimes. For these reasons, Mr. Treta requests that the court impose a sentence of fifteen years.

Respectfully submitted,

/s/ William J. Raymond
William J. Raymond
Assistant Federal Public Defender
818 Grand Avenue, Suite 300
Kansas City, Missouri 64106
(816) 471-8282

COUNSEL FOR DEFENDANT

**CERTIFICATE OF SERVICE**

In accordance with Rule 49(a), (b) and (d), Fed. R. Crim. P., and Rule 5(b), Fed. R. Civ. P., it is hereby certified that one copy of the foregoing Motion was electronically filed and sent to Teresa Moore, Assistant United States Attorney, Western District of Missouri, counsel for Plaintiff, 400 E. 9th St., 5th Floor, Kansas City, Missouri 64106, 26th day of October, 2015.

/s/ William Raymond
William Raymond